HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

NORTH SEATTLE COMMUNITY
COLLEGE FOUNDATION,

    Plaintiff,

    v.

GREAT AMERICAN E&S INSURANCE
COMPANY,

    Defendant.

CONSOLIDATED WITH C09-1259RAJ

LEAD CASE NO. C09-635RAJ

ORDER

(APPLIES TO ALL ACTIONS)

## I. INTRODUCTION

This matter comes before the court on cross-motions for summary judgment. Although the parties requested oral argument, the court finds their motions suited for disposition based on their briefs and accompanying evidence. As stated below, the court GRANTS the motion (Dkt. # 31) of Defendant Great American E&S Insurance Company ("Great American) in part and DENIES it in part, and DENIES the motion (Dkt. # 33) of Plaintiff North Seattle Community College Foundation (the "Foundation").

## II. BACKGROUND

The Foundation, a Seattle organization existing for the benefit of North Seattle Community College, operates a credit counseling service.[1] One of its credit services was

---

[1] The Foundation operates its credit counseling service through an arm known as American Financial Services. For simplicity, the court refers solely to the Foundation.

ORDER – 1

the creation and oversight of debt management plans with individuals with financial trouble. The Foundation negotiated with each of its customers' creditors to reduce his or her debts and consolidate them into a single monthly payment that it collected from each customer and used to pay his or her creditors.

In October 2007, Sherry Craft, one of the Foundation's customers, filed a class action in Georgia state court against the Foundation and others, alleging violations of Georgia's Debt Adjusting Act ("GDAA"). Ga. Code Ann. § 18-5-1 to 18-5-4. The amended complaint raised two claims on behalf of all of the Foundation's Georgia customers. First, the complaint alleged that the Foundation had collected a monthly fee of more than 7.5% of each customer's monthly debt in violation of the GDAA:

> In the course of engaging in debt adjusting, it shall be unlawful for any person to accept from a debtor who resides in this state, either directly or indirectly, any charge, fee, contribution, or combination thereof in an amount in excess of 7.5 percent of the amount paid monthly by such debtor to such person for distribution to creditors of such debtor . . . .

Ga. Code Ann. § 18-5-2. Second, the complaint alleged that while violating the GDAA, the Foundation had accepted "fair share contribution" payments from its customers' creditors, which are essentially fees that creditors paid the Foundation in exchange for the payments they received. As to the first claim, Ms. Craft sought "as damages an amount equal to the total of all fees, charges, contributions or combination thereof paid by Plaintiff . . . and all other sums allowed under OGCA §§ 18-5-1, *et seq*." Compl. ¶ 56. As to the second claim, she demanded "disgorgement from Defendants the amounts unjustly gained . . . through these so-called 'fair share contributions' and . . . any amounts awarded by this Court in this cause for Defendants' unjust gain." Compl. ¶ 61. The prayer for relief at the end of her complaint sought the same relief.

On November 6, 2007, the Foundation notified Defendant Great American Insurance Company ("Great American") of the Craft lawsuit. Great American had issued a professional liability insurance policy (the "Policy") covering the Foundation from July

ORDER – 2

14, 2007 through July 14, 2008. The Policy was subject to a $50,000 self-insured retention. The Foundation also had an insurance policy from AIG, and notified AIG of the Craft lawsuit as well. AIG agreed to provide a defense to NCSSF, subject to a reservation of rights.

Great American and the Foundation, through their counsel, quickly began discussions regarding coverage for the Craft lawsuit. On December 27, 2007, Great American's counsel summarized its position, analyzing the coverage provisions and exclusions of the Policy. Sternberg Decl. (Dkt. # 35), Ex. H. The letter did not take a coverage position, however, and instead concluded with the following equivocation:

> [T]here are some substantive coverage issues raised and serious questions as to whether the [Policy] provide[s] coverage, including any duty to defend. . . . [T]o the extent the [Policy] would apply, the self-insured retention would be applicable in any event. This provides us with some time to review these issues, discuss their impact on any potential coverage under the Great American policy and determine whether more definitive positions need to be taken.

*Id.* From this initial salvo, the parties began an exchange of letters and other communications that stretched on for months. The court need not recount the parties' back-and-forth; it suffices to observe that Great American continued to insist that the Policy might not provide coverage for various reasons, the Foundation continued to disagree, and Great American never took a formal position. By July 2008, the parties not only reached an impasse, they apparently ceased communicating with each other.

Despite failing to inform its insured of its coverage position, Great American sued the Foundation in January 2009 in the United States District Court for the Middle District of Georgia. By that time, the Craft lawsuit had been removed to the same court. Great American sought declaratory judgment that it had neither an obligation to defend the Foundation nor to indemnify it. The Foundation filed its own suit in this court, alleging that Great American had breached the Policy and had acted in bad faith. The Foundation

ORDER – 3

also successfully moved to transfer Great American's Georgia declaratory judgment suit to this forum. This court consolidated the two actions after the transfer.

The Foundation settled claims against it in the Craft litigation in December 2009. Keaton Decl. (Dkt. # 40) ¶ 2. It agreed to pay $1,025,000. *Id.* ¶ 3. Of the settlement payment, AIG contributed only $25,000, although it apparently paid all but $25,000 of the Foundation's defense costs. *Id.* The Foundation estimates its defense costs at just over $1,000,000. *Id.* ¶ 4. Although Great American was present for settlement negotiations in the Craft lawsuit, it contributed nothing to the settlement. *Id.* ¶¶ 2-3.

Now before the court are two summary judgment motions. Great American seeks summary judgment, arguing that it has no duty to defend or indemnify NSCFF and that it did not act in bad faith. NSCFF seeks partial summary judgment that Great American owed it a duty to defend the Craft litigation, and that Great American is liable for its attorney fees.

### III. ANALYSIS

On a motion for summary judgment, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party must initially show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The opposing party must then show a genuine issue of fact for trial. *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). The court defers to neither party in answering legal questions. *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

The court now applies this standard to determine whether the Policy covered the Claims in the Craft litigation, whether Great American had a duty to defend or indemnify the Foundation, and whether Great American acted in bad faith.

**A.      The Craft Lawsuit Raised Only Claims That the Policy Did not Cover.**

In Washington, insurance policy interpretation is a purely legal question. *Overton v. Consol. Ins. Co.*, 38 P.3d 322, 325 (Wash. 2002). The court must give the terms of the policy a "fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance." *Id.* (internal quotation omitted). Terms defined within a policy are to be construed as defined, while undefined terms are given their ordinary meaning. *Boeing Co. v. Aetna Cas. & Sur. Co.*, 784 P.2d 507, 511 (Wash. 1990). If policy language on its face is fairly susceptible to two different but reasonable interpretations, ambiguity exists, and the court will apply the interpretation most favorable to the insured. *Allstate Ins. Co. v. Peasley*, 932 P.2d 1244, 1246 (Wash. 1997) (cited in *Petersen-Gonzales v. Garcia*, 86 P.3d 210 (2004)); *Allstate Ins. Co. v. Hammonds*, 865 P.2d 560, 562 (Wash. Ct. App. 1994) (ambiguity exists "when, reading the contract as a whole, two reasonable and fair interpretations are possible."). Absent evidence that the parties negotiated the terms of the insurance policy, a court must construe ambiguity against the insurer "even where the insurer may have intended another meaning." *Allstate*, 865 P.2d at 562.

The court's application of the Policy to the Craft complaint requires it in each instance to carefully consider the nature of the relief that the complaint sought. The Foundation charged its customers a fee for its services, in the sense that each customer paid more to the Foundation than the Foundation paid to the customer's creditors. This practice is not per se unlawful. When the fee exceeds 7.5% of the customer's debt payment, however, the practice runs afoul of the GDAA. Ga. Code Ann. § 18-5-2. The only statutory remedy available to a customer for that violation, which the GDAA describes as a "*Penalty* for unlawfully engaging in the business of debt adjusting," is

ORDER – 5

liability "for an amount equal to the total of all fees, charges, or contributions paid by the debtor plus $5,000.00."[2] Ga. Code Ann. § 18-5-4(b)(2) (emphasis added to statutory heading). This remedy is, to say the least, not purely compensatory. To compensate consumers for being charged a fee in excess of 7.5%, they need only be awarded that portion of their fee that exceeds 7.5%. The Georgia legislature apparently thought a compensatory remedy insufficient, and thus added two components. One is a refund of portion of the fee that does not exceed 7.5%. The other is a $5000 award that is awarded without reference to the amount charged or overcharged. Thus, for a consumer whose monthly debt was $100, a debt adjuster could lawfully charge a fee of $7.50 per month. A debt adjuster who charged $7.51 per month for service on the same debt would violate the GDAA, but would cost the consumer only a penny above what a GDAA-compliant adjuster could charge. The consumer, however, would receive not merely the penny that she overpaid, but the remainder of the fee she paid ($7.50), plus $5000.

The fourth component of the relief sought in the Craft lawsuit is disgorgement of the Foundation's fair share contributions from creditors. This remedy is not at all compensatory. The complaint does not plead that the collection of fair share contributions violates the GDAA. It pleads instead that because the Foundation received fair share contributions while violating the GDAA, it should be forced to disgorge those contributions to plaintiffs.

Having considered the relief requested in the Craft lawsuit in this way, it is apparent that the Policy does not provide coverage for any component of the relief sought. The path to reaching that conclusion begins with the Policy's core coverage clause, which provides as follows:

> The Company shall pay on behalf of the Insured those sums . . . which the Insured shall become legally obligated to pay as a result of CLAIMS

---

[2] The statute provides for other penalties, including conviction of a misdemeanor and a "civil fine" of at least $50,000, but only the Georgia Attorney General is authorized to obtain those penalties. Ga. Code Ann. § 18-5-4(a), (b)(1), (c).

ORDER – 6

> FIRST MADE AGAINST THE INSURED AND REPORTED TO THE
> COMPANY DURING THE POLICY PERIOD . . . caused by any
> Wrongful act for which the Insured is legally responsible and arising out of
> the rendering or failure to render professional services . . . .

Policy, Page 1 of 9, ¶ 1.A. There is no dispute that Ms. Craft made her claim against the Foundation during the policy period and that the Foundation timely reported the claim to Great American. The Policy defines "Claim" as follows:

> "Claim" means a demand received by the insured for money damages and
> alleging a wrongful act including the service of suit . . . . Claim does not
> include a demand for equitable, non-pecuniary or injunctive relief, or for
> legal fees or expenses in connection therewith.

Policy, Page 2 of 9, ¶ II.B. "Damages," in turn, is defined as follows:

> "Damages" means monetary judgments or settlements, but does not include
> fines or statutory penalties, sanctions, whether imposed by law or
> otherwise, punitive or exemplary damages, [or] the multiplied portion of
> multiplied damages . . . .

Policy, Page 2 of 9, ¶ II.D.[3]

The court concludes that the $5000 that must be added to any GDAA award to a debtor is a "statutory penalty" within the meaning of the Policy. The statute itself calls every component of an award to a debtor a "penalty," but the court does not rely on the statute's characterization.[4] The $5000 award is a fixed amount that must be assessed for any proven violation of the statute. That component of the award is not compensatory. Indeed, as the court noted, a violation of the statute that costs the debtor only pennies will cost the defendant engaged in unlawful debt adjusting at least $5000. The Foundation's

---

[3] The parties devote inordinate attention in their briefs to what "damages" means in an insurance policy. *E.g.*, Def.'s Br. (Dkt. 31) at 9-11. Every case they cite addresses a policy in which "damages" is undefined. This Policy, however, explicitly defines damages as any "monetary judgments or settlements," excluding only particular types of monetary judgments.

[4] For example, the GDAA permits debtors to recover the portion of a debt adjustment fee that exceeds 7.5%, precisely compensating them for the harm arising from the unlawful practice of charging in excess of 7.5%. This relief is compensatory, and does not become a "statutory penalty" within the meaning of the Policy merely because the statute decrees it to be a "penalty."

ORDER – 7

sole argument for construing this award as something other than a penalty is that a penalty must be levied by a government actor. That limitation appears nowhere in the Policy. A statute that imposes a $5000 fee without regard to the damage caused by a defendant unambiguously imposes a penalty, and nothing in the Policy suggests that the Policy meant something else by "statutory penalty."[5]

The Policy does not provide coverage for the $5000 component of the relief sought in the Craft lawsuit; and the court concludes that the Policy's exclusions bar coverage for the remaining components. An insurer seeking to rely on a policy exclusion bears the burden of proving that the exclusion applies. *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 15 P.3d 115, 127 (Wash. 2000). Only where an exclusion "clearly and unambiguously applies to bar coverage" can the insurer rely on it. *Hayden v. Mutual of Enumclaw Ins. Co.*, 1 P.3d 1167, 1172 (Wash. 2000).

The court begins with the Policy's exclusion for any claim "for the disgorgement or reimbursement of monies collected by the Insured." Policy, Credit Counselors Limitation Endorsement, ¶ 15. The court concludes that the Craft plaintiffs' claim for disgorgement of fair share contributions unambiguously falls within the scope of this exclusion. In reaching this conclusion, the court does not rely solely on the complaint's explicit characterization of the relief requested as "disgorgement." The court's conclusion is driven by the fact that no other label describes the nature of the relief requested. The Craft plaintiffs' claim for fair share contributions is not compensatory or restitutionary, it is purely an effort to ensure that the Foundation does not profit from unlawful activity. It is a classic disgorgement remedy.

The court also concludes that the Craft plaintiffs' claim for recovery of the first 7.5% of the fees the Foundation collected from them is a claim for disgorgement. As the court noted, debt adjusters may lawfully charge a fee of up to 7.5% for their services.

---

[5] Great American offers extrinsic evidence that amounts to the opinion of various people on whether the GDAA imposes a "penalty." Even if the court were permitted to consider that extrinsic evidence, none of it addresses what the *Policy* means by "statutory penalty."

ORDER – 8

Only fees that exceed that percentage are unlawful. A customer of an unlawful debt adjuster can claim to be damaged by fees in excess of 7.5%, but absent a statute providing otherwise, they would have no claim to a compensatory award that included the portion of the fee that does not exceed 7.5%. The GDAA is not merely compensatory, it permits plaintiffs to obtain even the otherwise lawfully collected portion of the fee. This is unambiguously a claim "for the disgorgement . . . of monies collected by the Insured," and thus falls within that Policy exclusion.

The court next turns to the Policy's exclusion for "any claim based upon or arising out of . . . the Insured gaining in fact any personal profit, or advantage to which such Insured was not legally entitled." Policy, Page 3 of 9, ¶ III.H. By law, the Foundation was not permitted to collect fees in excess of 7.5% of a customer's monthly debt. The Craft plaintiffs' efforts to recover those excessive fees was unambiguously a claim for "personal profit, or advantage to which such Insured was not legally entitled."

For the reasons stated above,[6] the court concludes that each of the four components of the relief that the Craft plaintiffs requested was not a claim that the Policy covered. The plaintiffs sought disgorgement of the component equal to 7.5% of each plaintiff's monthly debt, as well as the fair share contributions that the Foundation received from creditors. Their effort to recover the amount of the fee the Foundation charged that exceeded 7.5% was a claim arising out of the Foundation gaining personal profit to which it was not legally entitled. Their effort to obtain a $5000 award was a claim for a statutory penalty. No sum that the Craft plaintiffs sought from the Foundation was covered by the Policy. Great American had no duty to indemnify the Foundation.

**B.     Great American Did Not Owe a Duty to Defend.**

An insurer's duty to defend its insured is broader than its duty to indemnify. *Woo v. Fireman's Fund Ins. Co.*, 164 P.3d 454, 459 (Wash. 2007). The complaint in a lawsuit

---

[6] Great American invoked several other policy exclusions, and also contended that the Policy was excess to AIG's policy. The court need not reach any of these issues.

ORDER – 9

filed against the insured is the trigger for the duty to defend. *Id.* An insurer must examine the allegations in the complaint, construe them liberally, and determine whether, if proven, the allegations would impose a liability on the insured that the policy would cover. *Id.*; *see also Truck Ins. Exchange v. Vanport Homes, Inc.*, 58 P.3d 276, 281-82 (Wash. 2002). Only where it would benefit the insured can the insurer look beyond the complaint itself:

> There are two exceptions to the rule that the duty to defend must be determined only from the complaint, and both the exceptions favor the insured. If coverage is not clear from the face of the complaint but may exist, the insurer must investigate the claim and give the insured the benefit of the doubt in determining whether the insurer has an obligation to defend. . . . Similarly, facts outside the complaint may be considered if (a) the allegations are in conflict with facts known to or readily ascertainable by the insurer or (b) the allegations of the complaint are ambiguous or inadequate.

*Truck Ins. Exchange*, 58 P.3d at 282 (internal citations and quotations omitted).

Great American had no duty to defend. For the reasons stated in the previous section, the Craft complaint itself gave Great American no reason to provide the Foundation with a defense. Nothing in the complaint conceivably seeks damages that the Policy would cover. The record reflects that Great American conducted further investigation, including several discussions with Foundation officials and the Foundation's counsel. Nothing in the record, however, shows that the Foundation discovered anything in its investigation that would have overcome the complaint's failure to raise a covered claim. For that reason, the court concludes that Great American had no duty to defend the Foundation as a matter of law.

**C.  The Court Cannot Resolve the Foundation's Bad Faith Claims as a Matter of Law.**

Having concluded that Great American had neither an obligation to defend the Foundation in the Craft lawsuit nor to indemnify it, only the Foundation's bad faith claim remains. The Foundation makes both a common law claim for a bad faith breach of the Policy and a bad faith claim invoking the Washington Consumer Protection Act ("CPA").

ORDER – 10

There is evidence to support both bad faith claims. Typically, a finding that the insurer had no duty to defend or indemnify would be dispositive of a contractual bad faith claim. *Am. States Ins. Co. v. Symes of Silverdale, Inc.*, 78 P.3d 1266, 1269 (Wash. 2003) (stating that bad faith requires an "unreasonable, frivolous, or unfounded" breach of an insurance contract). In this case, however, while the court concludes that Great American did not breach the Policy by failing to defend or indemnify, it may have otherwise breached the Policy. And it certainly may have breached one or more of the dozens of regulations incorporated into the CPA that govern an insured's obligation to process an insured's claim, to promptly notify the insured of coverage determinations, and to resolve coverage disputes without unduly harming the insured. For reasons it does not explain, Great American steadfastly refused to take a coverage position for more than a year. It neither took up the Foundation's defense nor declined to provide one; it neither promised coverage nor stated conclusively that it would not provide coverage. Then, with apparently no warning, it sued the Foundation in Georgia. Whether this conduct harmed the Foundation is an open question. *Safeco Ins. Co. of Am. v. Butler*, 823 P.2d 499, 503 (Wash. 1992) ("a showing of harm is an essential element of an action for bad faith handling of an insurance claim"). The court must presume harm, however, if an insured proves bad faith. *Id.* at 504. While Great American refused to state its position, the Foundation was attempting to resolve the Craft litigation, a process in which cooperation and straightforward communication from its insurers would likely have been to its strategic benefit. Moreover, by suing its insured in another state, it arguably caused the Foundation to incur costs it should not have had to pay, such as the cost of litigating over transferring the litigation here. On this record, the court cannot conclude that the Foundation suffered harm as a matter of law from Great American's conduct, but it cannot rule out the possibility either. The Foundation's bad faith claims will proceed to trial.

ORDER – 11

## IV. CONCLUSION

For the reasons stated above, the court GRANTS Great American's motion for summary judgment (Dkt. # 31) to the extent it seeks a declaratory judgment that it was neither obligated to defend nor indemnify the Foundation, but DENIES it to the extent it seeks dismissal of the Foundation's bad faith claim. The court DENIES the Foundation's motion (Dkt. # 33) for summary judgment.

Trial in this matter is set for March 29, 2010. The court notes that the parties have already participated in mediation. Until now, the parties' disputes have focused on their disagreements over the meaning of the Policy and its application to the Craft litigation. The parties may wish to revisit settlement discussions to focus on their dispute over Great American's bad faith, and they should contact the court if it can be of assistance.

DATED this 1st day of March, 2010.

The Honorable Richard A. Jones
United States District Judge

ORDER – 12